Angela Swan, #213793
THE LAW OFFICES OF ANGELA SWAN,
A PROFESSIONAL CORPORATION
21151 South Western Avenue, Suite 177
Torrance, CA  90501
Office Telephone:  (310)755-2515
Facsimile:         (310)878-0349
Email:             aswan@angelaswanlaw.com

Attorney for Plaintiff Billie Rene Frances Lillian Powers

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION – SANTA ANA

| | |
|---|---|
| Billie Rene` Frances Lillian Powers ) <br> Plaintiff, ) <br> vs. ) <br> BANK OF AMERICA, N.A.; THE ) <br> BANK OF NEW YORK MELLON ) <br> F/K/A THE BANK OF NEW YORK, ) <br> AS TRUSTEE, ON BEHALF OF ) <br> THE HOLDERS OF THE ) <br> ALTERNATIVE LOAN TRUST ) <br> 2007-HY9, MORTGAGE PASS- ) <br> THROUGH CERTIFICATES ) <br> SERIES 2007-HY9; SELECT ) <br> PORTFOLIO SERVICING, INC.; ) <br> QUALITY LOAN SERVICE ) <br> CORPORATION; MORTGAGE ) <br> ELECTRONIC REGISTRATION ) <br> SYSTEMS, INC.; ) <br> COMMONWEALTH LAND TITLE ) <br> INSURANCE COMPANY; JON ) <br> SECRIST; NICHOLE ) <br> CLAVADETSCHER; and DOES 1 to ) <br> 10, inclusive, ) <br> Defendants. ) | Case No. 8:17-cv-01386-DOC-KES <br><br> **VERIFIED THIRD AMENDED COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br> **(NOTICE OF PENDENCY OF ACTION (LIS PENDENS), PURSUANT TO CCP SECTIONS 405.20 AND 405.21 FILED CONCURRENTLY)** |

## JURISDICTION AND VENUE

1. The United States District Courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs… pursuant to 28 U.S.C. § 1332 (a).  This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, 19 U.S.C. § 1331, and 28 U.S.C. § 1331.

2. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 22 of the Securities Act, 15 U.S.C. §§ 77k and 77o, and 771(a)(2), 19 U.S.C. § 1331.

3. Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c).  Many of the acts and conduct complained herein, occurred in substantial part in this District, including the dissemination and recording of Documents, which contained material misstatements and omissions, complained of herein.  In addition, Defendants conduct business in this District.

## PARTIES

4. Plaintiff Billie Rene Frances Lillian Powers, a natural person, is a private individual within the meaning of California law and is a citizen of the State of California.  At all times relevant to this complaint, Plaintiff has owned the Property located in San Juan Capistrano unincorporated, County of Orange, State of California, bearing assessor parcel number 125-120-27, commonly known as 40701 Ortega Highway, San Juan Capistrano, CA 92530 ("Property").

5. COUNTRYWIDE originated residential mortgages on a massive scale and securitized loans to be sold to the Depositors, entities created by COUNTRYWIDE, as Mortgage-Backed Securities.  Plaintiff's home (Property) loan was one of the notes that were securitized.

6. COUNTRYWIDE, is the originator of Plaintiff's loan.  COUNTRYWIDE changed its name to BAC HOME LOANS SERVICING, LP ("BAC").  BAC merged with or was acquired by Defendant BANK OF AMERICA, NATIONAL ASSOCIATION ("BOA"), and became Defendant BOA in 2008.  Defendant BOA assumed COUNTRYWIDE'S liabilities, having paid to resolve other litigation arising from misconduct such as predatory lending allegedly committed by COUNTRYWIDE.

7.  Substantially all of COUNTRYWIDE'S assets were transferred to Defendant BOA on November 7, 2008, in connection with COUNTRYWIDE'S integration with Defendant BOA'S other businesses and operations. COUNTRYWIDE ceased filing its own financial statements in November 2008, and instead its assets and liabilities have been included in Defendant BOA'S financial statements.

8.  Defendant BOA, at times relevant to this complaint is a National Association bank doing business in the County of Orange, State of California. Defendant BOA is the originator of Plaintiff's loan, Depositor, and participant in the imperfect securitization of the Note and/or Mortgage/Deed of Trust.

9.  Defendant THE BANK OF NEW YORK MELLON F/K/A THE BANK OF NEW YORK, AS TRUSTEE, ON BEHALF OF THE HOLDERS OF THE ALTERNATIVE LOAN TRUST 2007-HY9, MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2007-HY9 ("BONY"), at times relevant to this complaint is a New York corporation, doing business in the County of Orange, State of California.  Defendant BONY is the Trustee of ALTERNATIVE LOAN TRUST 2007-HY9 and is a common law trust formed under the laws of the State of New York and a participant in the imperfect securitization of the Note and the Mortgage/Deed of Trust.

10.Defendant SELECT PORTFOLIO SERVICING, INC., at times relevant to this complaint is doing business in the County of Orange, State of California. Defendant SELECT PORTFOLIO SERVICING, INC. was a Mortgage Servicer of Plaintiff purported loan.

11.Defendant QUALITY LOAN SERVICE CORPORATION at times relevant to this complaint is doing business in the County of Orange, State of California, as Trustee.

12.Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS), at times relevant to this complaint is doing business in the County of Orange, State of California. Defendant MERS is the Beneficiary for the Securitized Trust ALTERNATIVE LOAN TRUST 2007-HY9 and is a purported participant in the imperfect securitization of the Note and/or the Mortgage/Deed of Trust.

13.Defendant COMMONWEALTH LAND TITLE INSURANCE COMPANY, at times relevant to this complaint is doing business in the County of Orange, State of California. Defendant COMMONWEALTH LAND TITLE INSURANCE COMPANY, as a Title Insurance Company.

14.Defendant JON SECRIST, an individual, at times relevant to this complaint is doing business in the County of Orange, State of California, as a Notary Public, who committed perjury on recorded documents.

15.Defendant NICHOLE CLAVADETSCHER, and individual, at times relevant to this complaint, is doing business in the County of Orange, State of California, as a Certifying Officer of MERS, a known robo signer.

VERIFIED THIRD AMENDED COMPLAINT
4

## STATEMENT OF FACTS

16. About April 13, 2007, Plaintiff opened escrow with West Coast Escrow to begin the process of purchasing Property from Delong ("Seller") for the purchase price of $1,700,000.00.

17. About April 17, 2007, Plaintiff received a document titled "Additional Escrow Instructions" from West Coast Escrow. The instructions indicated that title was to be vested in Plaintiff solely.

18. April 26, 2007 Seller executed a Grant Deed naming Plaintiff as the sole grantee and deposited the Grant Deed into escrow.

19. May 29, 2007, the Plaintiff received 2 documents each titled "Additional Escrow Instructions." Each document identified the Plaintiff as the sole buyer. *A True and correct copy of the Additional Escrow Instructions is attached hereto as Exhibit A and incorporated herein by reference.*

20. About June 1, 2007, one month after Plaintiff's Grant Deed was executed and notarized, she was advised by COUNTRYWIDE that she needed co-signor. Plaintiff's sister and brother-in-law, Jacqueline M. Hanson and Louis J. Hanson agreed to co-sign.

21. About June 27, 2007, Plaintiff, Jacqueline M. Hanson and Louis J. Hanson executed the Promissory Note ("Note") in the sum of $1,190.000.00 and Deed of Trust ("DOT") to secure the Note. The DOT was recorded in Riverside County; not Orange County. Jacqueline M. Hanson and Louis J. Hanson's signatures were executed by Plaintiff pursuant to a Power of Attorney. COUNTRYWIDE was the lender on the Note and was defined as the lender on the Deed of Trust. *True and correct copies of the Deed of Trust and Fixed/Adjustable Rate Rider, and Powers of Attorney are attached hereto as Exhibits B and C, and incorporated herein by reference.*

22.Jacqueline M. Hanson and Louis J. Hanson requested to be taken off title after escrow closed.

23.About July 2, 2007, escrow closed, although investor reports show that the purported loan closed on January 2009 and a new loan appearing on February 2009.

24.The Grant Deed was materially altered. The rightful owners' correct names were changed to "Billie Rene Powers", "Louise J. Hanson", and "Jacqueline M. Hanson"and was notarized using Nancy Gazon notary stamp without her knowledge. *A true and correct copy of the materially altered Grant Deed is attached hereto as Exhibit D, and incorporated herein by reference.*

25.About July 2, 2007, Plaintiff took possession of the Property, as her principal residence, until she was wrongfully evicted, September 21, 2017.

26.On July 10, 2007 a new title was recorded, honoring Jacqueline M. Hanson and Louis J. Hanson's request to be removed from title, placing the Property in Plaintiff's LLC's name, Rancho Sonata LLC. *A true and correct copy of the Grant Deed is attached hereto as Exhibit E, and incorporated herein by reference.*

27.November 2007, Plaintiff paid off her Home Equity Line of Credit of $170,000.00 with COUNTRYWIDE, which accounted for 10% of Plaintiff's initial down payment. A reconveyance of the DOT was recorded, but no original documents were returned to Plaintiff, as required.

28.About January 2008, Plaintiff made contact with COUNTRYWIDE to seek mortgage assistance. COUNTRYWIDE's employee stated that COUNTRYWIDE would only discuss mortgage assistance, if Plaintiff was 3 months delinquent on her mortgage payments; therefore, advised her to stop making payments.

29. Plaintiff relied on COUNTRYWIDE'S employee's advise and stopped making her payments as she was instructed to do in order to become eligible for mortgage assistance. Instead, COUNTRYWIDE initiated hardship onto Plaintiff.

30. About June 5, 2008 COUNTRYWIDE recorded a Notice of Default (NOD). Multiple Notices of Default and Trustee Sales were recorded and rescinded between 2008 and 2010.

31. Although, From October 2009 to February 2012, Thomas Peppers name was on title. Between 2008-2010, two (2) Loan Modifications were completed. Plaintiff was threatened if she did not sign the Loan Modification documents, despite the absence of Jacqueline M. Hanson and Louis J. Hanson's signatures, she would lose her home. Plaintiff informed Defendant BOA's employees that the Loan Modification was not legal without all the proper information of all borrowers.

32. About October 2009 an illegal foreclosure was held by Thomas Peppers, Second Trust Deed Holder. Thomas Peppers filed an unlawful detainer lawsuit post-foreclosure sale and Plaintiff prevailed February 2012. Thomas Peppers reconveyed title back to Plaintiff. The Second Trust Deed held by Thomas Peppers was settled as agreed and a reconveyance of the DOT was recorded.

33. COUNTRYWIDE informed Plaintiff that Thomas Peppers attempted to take over the First DOT, but they would not allow a takeover when there is evidence of fraud or misrepresentations.

34. About May 4, 2010, BAC sent Plaintiff a letter demanding what it determined to be the balance due on the Note. On May 6, 2010, BAC recorded a NOD, wherein it declared the Acceleration of the Balance Due on the Note. The acceleration of the Balance Due commenced its accrual of the six year statute of limitation, as provided by California Commercial Code § 3118(a).

35. Plaintiff was terrified and began experiencing mental anguish. As a result of Plaintiff's mental anguish affecting her inability to stay focused on her tasks, she began to miss a lot of work.

36. About October 26, 2010, a fraudulent document titled "Corporate Assignment of Deed of Trust" (Assignment of DOT") was recorded granting THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE, FOR THE CERTIFICATEHOLDERS CWALT, INC., ALTERNATIVE LOAN TRUST 2007-HY9 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-HY9, a company that doesn't exist, all beneficial interest under the DOT, dated June 27, 2007, and evidence of Defendant MERS' Certifying Officer's robo signature. *A true and correct copy of the Assignment of DOT is attached hereto as Exhibit F, and incorporated herein by reference.*

37. The Assignment of DOT demonstrates the robo signature of Defendant NICHOLE CLAVADETSCHER, a Certifying Officer of MERS, who is a known robo signer. The fraudulent Assignment of DOT was notarized by Defendant JON SECRIST, whose notary commission number is 1893949.

38. During the year of 2012, Plaintiff filed numerous complaints in an attempt to stop the trespassing and theft against her family's home, and be provided a remedy outside of court. Plaintiff filed complaints with law enforcement agencies and governing departments of finance regarding forgeries, identity theft, counterfeit securities, misrepresentations of facts, and questions of validation of debt against COUNTRYWIDE/Defendant BOA, and Co-Defendants and its affiliates.

39. In addition, Plaintiff filed a "Title Insurance Claim", with her title insurance company, Defendant COMMONWEALTH LAND TITLE INSURANCE COMPANY, in an effort to get assistance to stop the fraud against her title. Plaintiff's claim was denied numerous times and Plaintiff's title issues escalated.

40. About April 2012 Defendant SELECT PORTFOLIO SERVICING INC. became Plaintiff's Mortgage Loan Servicer and her account number changed.

41. About November 16, 2012, Plaintiff initiated a claim with Merchants Bonding Company, who provided a notary bond for Defendant JON SECRIST. Plaintiff alleged in her claim that the signature for Defendant NICHOLE CLAVADETSCHER on the Assignment of DOT was not genuine; therefore, Defendant JON SECRIST'S representation on the notary acknowledgement, made under penalty of perjury, that Defendant NICHOLE CLAVADETSCHER personally appeared before him, was false. *True and correct copies of the Proof of Claim and Merchant Bonding Company's Letter are attached hereto as Exhibits G and H, and incorporated herein by reference.*

42. Merchant Bonding Company requested more information to substantiate Plaintiff's claim. About February 27, 2013, after a 3-month investigation, Merchant Bonding Company ruled in Plaintiff's favor, validating the fact that the Assignment of DOT is fraudulent; therefore, void. Merchant Bonding Company paid Plaintiff actual damages according to the policy limit of $15,000.00. *A true and correct copy of the Check is attached hereto as Exhibit I, and incorporated herein by reference.*

43. About March 2013, California Attorney General, Kamala Harris's office agreed to investigate 18 cases of Mortgage Fraud, including Plaintiff's mortgage fraud. Fraudulent documents were gathered and presented by CJ Holmes of "Home Owners For Justice".

44. October 13, 2013, Defendant QUALITY LOAN SERVICE CORPORATION recorded a NOD and it was not the successor trustee; Therefore, had no authority to record such document. In addition, Defendant QUALITY LOAN SERVICE CORPORATION recorded a NOD based on a DOT that was

void.  The NOD falsely claimed that the sum necessary to reinstate the loan was $296,356.74 as of October 30, 2013.

45. December 6, 2013, Again Defendant QUALITY LOAN SERVICE CORPORATION recorded a NOD, without authority.  In addition, Defendant QUALITY LOAN SERVICE CORPORATION recorded a NOD based on a DOT that was void.  The NOD falsely claimed that the sum necessary to reinstate the loan was $304,305.74 as of October 30, 2013.  *A true and correct copy of the NOD is attached hereto as Exhibit J, and incorporated herein by reference.*

46. In 2014, Plaintiff was finally assigned an attorney from Defendant COMMONWEALTH LAND TITLE INSURANCE COMPANY.  However, the attorney was assigned to assist with Plaintiff's easement issues, instead, of her title issues.  **Plaintiff was informed by the attorney that her title claim was denied, because Defendant COMMONWEALTH LAND TITLE INSURANCE COMPANY would have to prosecute itself**.

47. February 2014, investigation had not commenced as promised by the Attorney General Kamala Harris's office pertaining to Mortgage Fraud.  Plaintiff spoke directly with Los Angeles Deputy Attorney General David Peyman regarding the investigation of the 18 cases of Mortgage Fraud, now called "The California 18".  Deputy Attorney General David Peyman said to Plaintiff, **"it only takes one piece of fraud to make the contract void, per contract law."**  Deputy Attorney General David Peyman promised to forward Plaintiff's claim to the Orange County District Attorney's Office, but he could not promise any assistance from them.

48. February 28, 2014, a Substitution of Trustee, was recorded naming Defendant QUALITY LOAN SERVICE CORPORATION as successor Trustee

VERIFIED THIRD AMENDED COMPLAINT
10

under the DOT. *A true and correct copy of the Substitution of Trustee is attached hereto as Exhibit K, and incorporated herein by reference.*

49. March 2014, Plaintiff performed an audit and reconciliation of records as the Custodian of Records. Plaintiff accepted the original Grant Deed's existence in the audit of records/reconciliation; however, she never seen it.

50. Prior to August of 2014, Plaintiff attempted to contact Nancy F. Ganzon, the notary who notarized the original Grant Deed that was materially altered, forged, and recorded. Plaintiff attempted to locate Nancy F. Ganzon and she was unable to locate her; therefore, Plaintiff filed a claim against Nancy F. Ganzon's notary bond.

51. Nancy F. Ganzon contacted Plaintiff regarding the fraudulent Grant Deed. About August 27, 2014, Nancy F. Ganzon executed an affidavit declaring that the Grant Deed recorded is a fraudulent Grant Deed, bearing her signature and notary stamp; however, it is not the Grant Deed she notarized, but instead is an altered version of the one she notarized. *A true and correct copy of the Affidavit of Nancy F. Ganzon notarized on November 11, 2014, is attached hereto as Exhibit L, and incorporated herein by reference.*

52. September 25, 2014, a NOD was recorded by Defendant QUALITY LOAN SERVICE CORPORATION. Again, Defendant QUALITY LOAN SERVICE CORPORATION was not the successor Trustee; therefore, it had no authority to record such document. In addition, Defendant QUALITY LOAN SERVICE CORPORATION recorded a NOD based on a DOT that was void. The NOD falsely claimed that the sum necessary to reinstate the loan was $356,429.14 as of September 23, 2014. In addition, **the NOD, falsely states under penalty of perjury that "the provisions of California Civil Code § 2923.55 do not apply**

1  **because the property is not owner occupied as defined by Civil Code §**
2  **2924.15**."

3  53. November 18, 2014, Plaintiff's LLC, Rancho Sonata grants Property to
4  Plaintiff. *A true and correct copy of the Bank Statement is attached hereto as*
5  *Exhibit M, and incorporated herein by reference.*

6  54. April 2015, Plaintiff ran a legal publication in the newspaper regarding the
7  fraudulent Grant Deed and other legal issues affecting her home, estate and heirs.

8  55. July 2015, Plaintiff recorded a NOD against Defendant BONY for failure to
9  cure the fraud. Plaintiff provided an affidavit with supporting evidence, including
10 a Waiver of Tort of 15.3 million dollars and treble damages of 1.7 million dollar.
11 The foundation of Plaintiff's damages: 1) forged Grant Deed; 2) landlocked
12 property; and 3) void Corporation Assignment pursuant to notary fraud. *A true*
13 *and correct copy of the Notice of Default recorded against Defendant BONY is*
14 *attached hereto as Exhibit N, and incorporated herein by reference.*
15

16 56. All parties were noticed by registered mail and leading up to the day of the
17 foreclosure sale through registered mail, fax, email and phone. Defendant BONY
18 never responded; despite the direct evidence of material facts and fraudulent NODs
19 recorded.

20 57. September 30, 2015, a Notice of Trustee's Sale was recorded.

21 58. October 7, 2015, Plaintiff and her family were assaulted at gun point by the
22 Orange County Swat, without a warrant. The Deputy Sheriff claimed that
23 Plaintiff's Property was foreclosed upon and sold, and Plaintiff was a tenant
24 refusing to leave. Also, Plaintiff's utilities were shutoff with false claims.

25 59. Plaintiff notified Sheriff Hutchens via email and phone calls regarding the
26 terror and fear inflicted upon Plaintiff and her family by the Orange County Sheriff
27 Department, as they assisted cell tower employees to trespass onto Plaintiff's land.

28

60. About February 29, 2016, Plaintiff had a third party, Authorized Agent, Keith Pillich, hold a scheduled meeting in Utah with Defendant SELECT PORTFOLIO SERVICING, INC., Plaintiff's purported Loan Servicer. This was the second in-house meeting where original documents were to be produced and they were not.

61. The meeting was scheduled to inspect original, wet ink signature, documents. After 2 hours, Plaintiff on speaker phone, while texting with Keith Pillich, Attorney Scott Hansen, counsel for Defendant SELECT PORTFOLIO SERVICING, INC. and other representatives of the company failed to produce the documents, as promised. Attorney Scott Hansen told Keith Pillich to have Plaintiff to contact him for settlement negotiations; however, $30.4 million was discussed.

62. About March 2016, Plaintiff opened an escrow with Shamrock Escrow in order to negotiate the settlement, per Attorney Scott Hansen. The NOD Plaintiff filed against Defendant BONY et al and costs were included. A third party representative, Christine Fitzpatrick, handled the emails between Defendant SELECT PORFOLIO SERVICING, INC. and the escrow company. Defendant SELECT PORFOLIO SERVICING, INC. failed to complete negotiations, instead it foreclosed upon Plaintiff's Property; **dual tracking**.

63. August 8, 2016, more than six years after the Acceleration of Debt, Plaintiff Property was foreclosed upon; a Trustee Sale was conducted by Defendant QUALITY LOAN SERVICE CORPORATION, utilizing fraudulent documents. Plaintiff made every attempt through multiple cease and desist letters, phone calls, facsimiles, and emails leading up to the very moment of the Trustee Sale to inform the purported Trustee of the illegal Foreclosure against her Property.

64. August 15, 2016, Defendant QUALITY LOAN SERVICING CORPORATION executed a Trustee's Deed Upon Sale, which did not appear in

the land records until after September 23, 2016. The Trustee's Deed Upon Sale
conveys the Property to Defendant THE BANK OF NEW YORK MELLON,
F/K/A THE BANK OF NEW YORK, AS TRUSTEE, ON BEHALF OF THE
HOLDERS OF THE ALTERNATIVE LOAN TRUST 2007-HY9, MORTGAGE
PASS-THROUGH CERTIFICATES SERIES 2007-HY9 (Defendant BONY).
**The company that initiated the foreclosure process is not the holder of the
beneficial interest under the mortgage or deed of trust; therefore, did not have
authority to foreclose**; moreover, the company does not exist. *A true and correct
copy of the Trustee's Deed Upon Sale attached hereto as Exhibit O, and
incorporated herein by reference.*

65. Subsequent to the August 15, 2016 foreclosure sale, Defendant BONY, as
Trustee, for the Certificate Holders of the REMIC Trust filed an unlawful detainer
lawsuit against Plaintiff.

66. About October 2016, the Property tax bill was still in Plaintiff's name.

67. January 2017, Plaintiff found a letter on her gate from a realtor offering her
Cash for Keys.

68. Plaintiff sent the realtor company a demand letter requesting proof of
representation and a cease and desist letter, with a Waiver of Tort for damages in
the event any action was taken without proof of standing.

69. June 8, 2017, Plaintiff recognized an unlawful detainer lawsuit, filed by
Defendant BONY, taped to her gate, stating that she was served a 3/90 Foreclosure
Notice to Quit. Plaintiff was never served any type of notices.

70. The Wolf Law Offices responded on Plaintiff's behalf, with supporting
documentation relating to the Wrongful Foreclosure. Plaintiff did not worry,
because she believed her attorney was handling her unlawful detainer lawsuit.

71. July 31, 2017, Plaintiff received a call from Deputy Sheriff Theis, informing Plaintiff that an eviction hearing is scheduled for August 6, 2017. Deputy Sheriff Theis stated he called to inform Plaintiff of the posting, because he was aware that Plaintiff no longer resided in my home. Plaintiff explained that she has always resided in her home.

72. In an attempt to protect Plaintiff and her children, August 11, 2017, Plaintiff filed a Federal Lawsuit, as a pro per litigant for Breach of Contract; not knowing what else to do.

73. About August 29, 2017, Plaintiff suffered a TIA, mini-stroke and was hospitalized. Plaintiff continues to be under the doctor's care for medical, and emotional and psychological injuries.

74. August and September 2017, Plaintiff filed 2 Ex Parte Applications to stop the Writ of Possession from being issued. Plaintiff announced in open court that she was never given notice of the court date in order to be present. Also, Plaintiff announced and presented in open court that the documents utilized to evict Plaintiff and her family from their home are fraudulent.

75. In addition, the realtor and process server admitted in open court to knowing a false address was used for service. Plaintiff's Ex Parte Application was denied; despite, compelling evidence of fraud. About September 19, 2017, Plaintiff filed an appeal, which was denied.

76. September 21 2017, approximately 8:50 am, while Plaintiff was absent from home to meet with her attorney, Richard Snyder, her roommate called hysterical, crying as Plaintiff's home was surrounded by Deputy Sheriffs in Sheriffs vehicles and plain Clothes Officers, pointing assault weapons, accompanied by a helicopter, demanding her to come out with her hands up to execute a lock out. Excessive force was used to intimidate and in retaliation.

77. October 2017, Attorney Snyder made calls to obtain Plaintiff's belongings. **A Notice to Reclaim Personal Property** was never served. Plaintiff and her family lost all their personal belongings; everything they owned.

78. Plaintiff later learned that Defendant BONY is not the lawful owner of the Property; therefore, not having legal right to evict.

79. October 5, 2017, Plaintiff sent Brian Moynihan of Defendant BOA an email, followed by a registered letter requesting a copy of the IRS 8594, and stating information regarding the illegal foreclosure held against Plaintiff's Property. Defendant BOA is required to answer; however, Defendant BOA never responded.

80. Bank Statements, including the payoff amount for the Property, continues to come in Plaintiff's name. *A true and correct copy of the Bank Statement is attached hereto as Exhibit N, and incorporated herein by reference.*

81. Defendants named in this action have no firsthand knowledge and Plaintiff want to rebut any presumption of standing. Anything entered by attorneys is hearsay.

82. Defendants conduct, as set forth herein, constitute fraud, malice, or gross negligence such that Defendants are liable and Plaintiff is entitled to punitive damages and Attorney's cost and expenses for which Plaintiff seeks judgment of this Court.

83. Defendants had actual, subjective awareness of the risk involved in the above described acts or omissions, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiff and others.

84. Plaintiff intends to show that the factors the jury may consider in determining the amount of punitive damages, which should be awarded include:

a. The nature of the wrong committed by Defendants;

b. The character of Defendants' conduct;

c. The degree of culpability of Defendants;

d. The situation and sensibilities of the parties concerned; and

e. The extent to which Defendants' conduct offends a public sense of justice and propriety.

**EXPLANATION OF SECURITIZATION**

85. Securitization is the process whereby mortgage loans are turned into securities, or bonds, and sold to investors by Wall Street and other firms. The purpose is to provide a large supply of money to lenders for originating loans, and to provide investments to bond holders which were expected to be relatively safe. The procedure for selling of the loans was to create a situation whereby certain tax laws known as the Real Estate Mortgage Investment Conduit (hereinafter "REMIC") Act were observed, and whereby the Issuing Entities and the Lenders would be protected from either entity going into bankruptcy, and get pass-through taxation treatment so only the investors would be taxed on earned income. In order to achieve the desired "bankruptcy remoteness," numerous "True Sales" of the loans had to occur, in which loans were sold and transferred to the different parties to the securitization for value.

86. A "True Sale" of the loan would be a circumstance whereby one party owned the Note and then sold it to another party. An offer would be made, accepted and compensation given to the "seller" in return for the Note. The Notes would be transferred by indorsement, and the Deeds of Trust assigned to the buyers of the Note, with an Assignment or Transfer made every step of the way between each party.

87. Each REMIC created by the investment banks, usually under New York Law, would be funded with thousands to tens-of-thousands of Mortgage Notes. In

order to maintain its' bankruptcy-protected status, REMIC's had to have closing dates by which every Mortgage Note and/or security device like a Mortgage of Mortgage/Deed of Trust was to be sold into the REMIC and had to be "owned" by the REMIC. Once the REMIC closed, it could accept no more Mortgage Notes under the terms of REMIC law, and it would begin selling securities backed by payments from homeowners on the Notes it "owned".

88. How a particular mortgage loan ended up being transferred to a REMIC in the securitization process is governed by a contract known as a Pooling and Servicing Agreement ("PSA"). The PSA is a Trust Agreement required to be filed under penalty of perjury with the United States Securities and Exchange Commission ("SEC") and which, along with another document, the Mortgage Loan Purchase Agreement ("MLPA"), is the operative securitization document created by the finance and securitization industry to memorialize securitization transactions.

89. The PSA governing the REMIC requires Plaintiff's Note and Deed of Trust to be indorsed and assigned, or transferred, respectively, to the trust and executed by multiple intervening parties in a specific chain of assignment before it reaches the REMIC Trustee. No recorded assignment of the Deed of Trust or transfer of the Note, to gain ownership of Plaintiff's Mortgage, was ever recorded in the local real property records, as required under the PSA.

90. When the Plaintiff closed on her Property, her Original Lender, Realty Mortgage Corporation, dba Mylor Financial (August 2007, business dissolved), signed a PSA that governed Plaintiff's particular Mortgage Note. The PSA agreement, details the closing date by which the homeowner's loan must be "sold" into the REMIC, and describes exactly how the homeowner's Note is to find its way from the Original Lender to the REMIC trust.

91. A typical PSA calls for a homeowner's Note to be transferred at least four times to different key parties before it comes into possession of the REMIC trustee. Here is a chart detailing the typical key party assignment chain required by a typical PSA:



92. Under the common law, the holder of the Note has the right to payments on the Note, and the holder of the Note would also hold the powers under the Deed of Trust, like the right to foreclose on the homeowner if the homeowner defaults on the Note. Traditionally, before investment banks began securitizing Mortgage Notes, the holder of the Note would universally hold the Mortgage/Deed of Trust. This made sense because the party with the right to collect payments on the Note would want to be able to foreclose using the Mortgage/Deed of Trust if the homeowner defaulted.

93. However, to streamline the securitization process, the investment banks created an entity called Mortgage Electronic Registrations System ("MERS"). The investment bank, in addition to using MERS, an electronic database, to track the buying, selling, and assignments of the Securitized Mortgage Note (bypassing the county clerks' offices), named MERS as a "nominee" or "beneficiary" in the Deed of Trust, and sold the Note into securitization but not the Deed of Trust, thereby unlawfully separating the Mortgage Note from the Deed of Trust.

94. Plaintiff alleges that Defendants cannot show proper receipt, possession, transfer, negotiations, assignment and ownership of the borrower's original

Promissory Note and Deed of Trust, resulting in imperfect security interests and claims.

95. Plaintiff further alleges that Defendants cannot establish possession and proper transfer and/or indorsement of the Promissory Note and/or proper assignment of the Deed of Trust; therefore, none of the Defendants have perfected any claim of title or security interest in the Property.  Defendants do not have the ability to establish that the Mortgage/Deed of Trust that secures the indebtedness, or Note, were legally or properly acquired.

96. The transfers of Plaintiff's debt or obligation did not comply with New York Law, and other laws and statutes, and, thus, do not constitute valid and enforceable "True Sales." Defendant CR TITLE SERVICES, INC. did not have the requisite title, perfected security interest or standing to proceed in a foreclosure.

97. Plaintiff alleges that an actual controversy has arisen and now exists between the Plaintiff and Defendants. Plaintiff desires a judicial determination and declaration of her rights with regard to the Property, Promissory Note, and Deed of Trust.

98. Plaintiff also seeks damages and for cancellation of written instruments based upon, but not limited to:  (a) Void "True Sale(s)," assignments and/or transfers of the Note and Deed of Trust violating New York law and express terms of the Pooling and Servicing Agreement ("PSA") governing the securitization of Plaintiff's Mortgage; (b) An incomplete and ineffectual perfection of a security interest in Plaintiff's Home due to void transfers and/assignments of Plaintiff's note, and (c) giving no notice of those assignments under the Truth in Lending Act.

**THE ASSIGNMENT OF THE PLAINTIFF'S
DEED OF TRUST FROM MERS IS VOID**

Defendant MERS was named the "beneficiary" of the Mortgage/Deed of Trust.
Defendant MERS lacks the authority under its corporate charter to foreclose a
mortgage, or to own or transfer an interest in a Securitized Mortgage because
MERS charter limits MERS' powers and duties to functioning as an electronic
registration system of certain types of securities for member banks only.

99. Documents have not been submitted authorizing Defendant MERS, as
nominee for the original lender, to assign the Deed of Trust to Defendant BONY.
Hence, Defendant MERS lacked authority as mere nominee to assign Plaintiff's
purported Deed of Trust, making any assignment from Defendant MERS defective.
In the instant action, Defendant MERS, as the nominee not only lacks authority to
assign the Deed of Trust, but cannot demonstrate the REMIC Trustee's knowledge
or consent to the assignment by Defendant MERS to Defendant BONY.

100.     Any attempt to transfer the beneficial interest of a Trust Deed without
actual ownership of the underlying Note, is void under law. Therefore, Defendant
MERS cannot establish that its assignment to Defendant BONY is valid and not
void.

**LACK OF STANDING TO FORECLOSE**

101.     Plaintiff is informed and believes, and thereon alleges, that in order to
conduct a foreclosure action, a person or entity must have standing.

102.     Plaintiff contends that Defendant QUALITY LOAN SERVICE
CORPORATION did not have the standing to foreclose on the Property.
Defendants cannot show duly perfected title, nor can they show a complete chain
of valid assignments or transfers of the Note together with the Deed of Trust along
the chain of securitization.

103.    There were no actual assignments or transfers of the Note at any stage
of the securitization chain of title, most commonly: 1) Original Lender to
Aggregator; 2) Aggregator to Sponsor; 3) Sponsor to Depositor; 4) Depositor to
New York Statutory Pass-Through Trust).  If there were any such assignments,
each is fraudulent, or void.

104.    Defendant MERS did not comply with the terms of the securitization
requirements, contained in the PSA.

105.    Plaintiff requests that this Court find that the purported power of sale
contained in the Deed of Trust had no force and effect, because Defendants'
actions in the processing, handling and foreclosure involved numerous fraudulent,
false, deceptive and misleading practices, including, but not limited to, violations
of Federal Laws designed to protect borrowers, which has directly caused Plaintiff
to be at an equitable disadvantage.

106.    Defendants, through the actions alleged above, have or claim the right
to have legally foreclosed, August 8, 2016, under said Deed of Trust, a foreclosure
sale supported by false and fraudulent documents, which has caused and continues
to cause Plaintiff great and irreparable injury.  Plaintiff has suffered physical,
psychological, emotional, and economic damages.

## CAUSES OF ACTION
### (Against All Defendants)

## COUNT I:  CONSPIRACY

107.    Plaintiff re-alleges and incorporates by reference all preceding
paragraphs as though fully set forth herein.

108.    This claim is predicated upon Defendants' strict liability for material
misstatements and omissions in the mortgage loan transfer to a REMIC in the

securitization process, governed by a PSA, a Trust Agreement filed under penalty
of perjury with the United States Securities and Exchange Commission.

    a. Defendants systematically ignored underwriting standards imposed by
state and federal laws in issuing the mortgages pooled into the
REMIC.

    b. Defendants promoted "unfair" loans under California law and
concealed problems with mortgages, failing to take sufficient steps to
avoid placing problem loans in securitization pools. The unfair
business practices included:  Coaching borrowers to misstate their
income on loan applications to qualify for mortgage loans; steering
borrowers to more expensive loans that exceeded their borrowing
capacity; encouraging borrowers to borrow more than they could
afford, when they could not qualify for full documentation loans
based on their actual incomes; Incentivizing its employees to approve
borrowers under exceptions to underwriting policies; and
systematically overriding flags identified by the CLUES system that
was meant to weed out non-qualifying loans and nonetheless
approving such loans.

    c. Plaintiff has demonstrated herein how Defendants conspired against
Plaintiff, inflicting continuous emotional distress, for one cause,
"economic gain." The scheme consisted of many attempts to take
Plaintiff's home, violating her rights, despite the threat of becoming
physically harmed and homeless.

    d. Each Defendant by virtue of his, her or its control, ownership, offices,
directorship, and specific acts was, at the time of the wrongs alleged
herein and as set forth herein, a controlling person of Defendant BOA

within the meaning of Section 15 of the Securities Act.  Defendants had the power and influence, and exercised the same to cause Defendant BOA to engage in the acts described herein.

109.    Defendants acted in concert and conspired together to commit the tortious acts described herein. Accordingly, these Defendants should be held jointly and severally liable for any damages awarded to Plaintiff as a result of this action.

## COUNT II:  VIOLATION OF DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ("HUD")

110.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

111.    HUD has promulgated regulations outlining the mortgage servicing responsibilities of mortgagees, 24 C.F.R. § 203.500, et seq., which were never followed in this case.  The government-insured mortgage loan program has a salutary goal of promoting better housing for lower income individuals. *See Ferrell, 743 F.2d at 455-56*. As *Ferrell* notes, the program recognizes that its mortgagors will often have difficulty making full and timely payments.  Id. at 456. The notice requirements considered today, as well as the mortgage assignment program, both ensure that financially strapped homeowners will have every opportunity to take informed steps to retain their homes.

112.    Defendant BOA is in violation of CFR 203.604, which states that "Mortgagee must have a face to face interview with Mortgagor, or make a reasonable effort to arrange a face to face interview" the Defendant did not comply with this portion of the code because Plaintiff never received a certified return receipt of the notice to meet.

113.     Defendant BOA did not comply with CFR 203.675 regarding the
Notice of Pending Acquisition required by Mortgagee before conclusion of the
foreclosure.  Defendant BOA is not in compliance with section 203.606 of the
Federal Regulations Code (Pre-Foreclosure Review), because they have not met
any of the other requirements of the code and for these reasons Plaintiff seeks
relief.  Defendants did not follow requirements in compliance with servicing
guidelines for conducting a H.U.D. approved foreclosure.

114.     The initiation of the foreclosure proceedings, August 8, 2016, by
Defendant QUALITY LOAN SERVICE CORPORATION was not authorized by
the Secretary of HUD nor in compliance with CFR Sections 203.500, 602, 604,
606, and 675 which governs the procedures oFf how servicers are to handle
defaults of a federally insured loan.  Moreover, the Notice of Default was not in
compliance with CFR Section 203.602, as per the ruling in *Federal National
Mortgage Association v. Moore 609 F. Supp. 194 (N.D.Ill 1985)*.  This document
affected the interest in real estate and, if recorded was required to be recorded
truthfully, to allow the general public access to honest records.

115.     §203.500   Mortgage servicing:  This subpart identifies servicing
practices of lending institutions that HUD considers acceptable for mortgages
insured by HUD. Failure to comply with this subpart shall not be a basis for denial
of insurance benefits, but failure to comply will be cause for imposition of a civil
money penalty, including a penalty under §30.35(c)(2), or withdrawal of HUD's
approval of a mortgagee. It is the intent of the Department that no mortgagee shall
commence foreclosure or acquire title to a property until the requirements of this
subpart have been followed.

116.     §203.502   Responsibility for servicing:  (a) After January 10, 1994,
servicing of insured mortgages must be performed by a mortgagee that is approved

by HUD to service insured mortgages. The servicer must fully discharge the servicing responsibilities of the mortgagee as outlined in this part. The mortgagee shall remain fully responsible to the Secretary for proper servicing, **and the actions of its servicer shall be considered to be the actions of the mortgagee**. The servicer also shall be fully responsible to the Secretary for its actions as a servicer.

117.    (b) Whenever servicing of any mortgage is transferred from one mortgagee or servicer to another, notice of the transfer of service shall be delivered: (1) By the transferor mortgagee or servicer to the mortgagor. The notification shall be delivered not less than 15 days before the effective date of the transfer and shall contain the information required in §3500.21(e)(2) of this title; and (2) By the transferee mortgagee or servicer: (i) To the mortgagor. The notification shall be delivered not less than 15 days before the effective date of the transfer and shall contain the information required in §3500.21(e)(2) of this title; and (ii) To the Secretary. This notification shall be delivered within 15 days of the transfer, in a format prescribed by the Secretary.

118.    (e) Each servicer of a mortgage shall deliver to the mortgagor a written notice of any assignment, sale, or transfer of the servicing of the mortgage. The notice must be sent in accordance with the provisions of §3500.21(e)(1) of this title and shall contain the information required by §3500.21(e)(2) of this title. Servicers must respond to mortgagor inquiries pertaining to the transfer of servicing in accordance with §3500.21(f) of this title.

119.    §203.604  Contact with the mortgagor: (b) The mortgagee must have a face-to-face interview with the mortgagor, or make a reasonable effort to arrange such a meeting, **before three full monthly installments due on the mortgage are unpaid**. If default occurs in a repayment plan arranged other than during a

personal interview, the mortgagee must have a face-to-face meeting with the mortgagor, or make a reasonable attempt to arrange such a meeting within 30 days after such default and at least 30 days before foreclosure is commenced, or at least 30 days before assignment is requested if the mortgage is insured on Hawaiian home land pursuant to section 247 or Indian land pursuant to section 248 or if assignment is requested under §203.350(d) for mortgages authorized by section 203(q) of the National Housing Act.

120.    (d) A reasonable effort to arrange a face-to-face meeting with the mortgagor shall consist at a minimum of one letter sent to the mortgagor certified by the Postal Service as having been dispatched.  Such a reasonable effort to arrange a face-to-face meeting shall also include at least one trip to see the mortgagor at the mortgaged property, unless the mortgaged property is more than 200 miles from the mortgagee, its servicer, or a branch office of either or it is known that the mortgagor is not residing in the mortgaged property.  (ii) Inform the mortgagor of other available assistance, if any; (iii) Inform the mortgagor of the names and addresses of HUD officials to whom further communications may be addressed.

121.    §203.614  Special forbearance:  If the mortgagee finds that a default is due to circumstances beyond the mortgagor's control, as defined by HUD, the mortgagee may grant special forbearance relief to the mortgagor in accordance with the conditions prescribed by HUD.

122.    §203.616  Mortgage modification:  The mortgagee may modify a mortgage for the purpose of changing the amortization provisions by recasting the total unpaid amount due for a term not exceeding 360 months. The mortgagee must notify HUD of such modification in a format prescribed by HUD within 30 days of the execution of the modification agreement.

123.     §203.675  Notice to occupants of pending acquisition:  (a) At least 60
days, but not more than 90 days, before the date on which the mortgagee
reasonably expects to acquire title to the property, the mortgagee shall notify the
mortgagor and each head of household who is actually occupying a unit of the
property of its potential acquisition by HUD. The mortgagee shall send a copy of
this notification to the appropriate HUD Field Office.

124.     Plaintiff never received notice, when the purported mortgage loan was
transferred to Defendant SELECT PORTFOLIO SERVICING, INC.; Defendants
never responded to Plaintiff's inquires; Plaintiff was instructed by the mortgagor's
employee that she could not receive mortgage assistance until she was three month
delinquent; and Plaintiff never received a certified letter to arrange a face-to-face
visit to discuss her options before foreclosure.

**COUNT III: VIOLATION OF HOMEOWNER'S BILL OF RIGHTS**

125.     Plaintiff re-alleges and incorporates by reference all preceding
paragraphs as though fully set forth herein.

126.     California Code of Civil Procedure, Section 2923.55 requires the
mortgage servicer to send a statement to the borrower stating that the borrower
may have rights under the Federal Servicemembers Civil Relief Act, and a
statement that the borrower may request a copy of the borrower's promissory note,
deed of trust or mortgage, "any assignment, if applicable, of the borrower's
mortgage or deed of trust required to demonstrate the right of the mortgage
servicer to foreclose," and a copy of the borrower's payment history…

127.     California Code of Civil Procedure, Section 2923.7 states, upon
request from a borrower who requests a foreclosure prevention alternative, the
mortgage servicer must promptly establish a single point of contact and provide to

the borrower one or more direct means of communication with the single point of contact. The "single point of contact" must be either an individual or team of personnel each of whom is knowledgeable about the borrower's situation and has the ability and authority to carry out specified types of activities relating to the borrower's situation such as ensuring that the borrower is considered for foreclosure prevention alternatives offered by or through the mortgage servicer and informing the borrower about the status of his or her application.

128.     Upon Plaintiff's request of a foreclosure prevention alternative, she was not provided a "single point of contact." Plaintiff requested that the fraudulent documents be cured and she was ignored. She also required inquiries and was ignored.

129.     Prohibition on "Robosigning", California Code of Civil Procedure, Section 2924.17 says that declarations recorded pursuant to Sections 2923.5 or 2923.55, notices of default, notices of sale, assignments of deeds of trust, and substitutions of trustee recorded in connection with a nonjudicial foreclosure, and declarations filed in court with respect to any foreclosure proceeding must be accurate and complete and supported by competent and reliable evidence. Before recording any of those documents, the mortgage servicer must review competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information.

130.     Plaintiff's mortgage servicer permitted fraudulent real estate document to be recorded and an illegal foreclosure to occur. Defendant NICHOLE CLAVADETSCHER, robo signature appears on record documents; despite code specifying "the mortgage servicer must review competent and reliable evidence to substantiate the borrower's default.

131.     The law prohibits Dual Tracking.  California Code of Civil Procedure, Section 2924.18 states, if a borrower submits a complete application for a first lien loan modification offered by, or through, the borrower's mortgage servicer, the mortgage servicer shall not record a notice of default, record a notice of sale, or conduct a trustee's sale while the complete application is pending, and until the borrower has been provided with a written determination by the mortgage servicer regarding that borrower's eligibility for the requested loan modification.  Plaintiff's First Lien Loan Modification Application was complete and submitted, when the Notice of Trustee Sale was recorded and the nonjudicial foreclosure sale was conducted.

132.     California Code of Civil Procedure, Section 2924.19 provides a private right of action against Smaller Residential Mortgage Lenders for material violations of Sections 2923.5, 2924.17 or 2924.18, and Section 2924.12 provides a private right of action against Larger Residential Mortgage Lenders for material violations of Sections 2923.55, 2923.6, 2923.7, 2924.9, 2924.10, 2924.11, or 2924.17.  After foreclosure, a borrower may recover actual economic damages resulting from a material violation of any of those sections, where the violation was not corrected prior to the foreclosure. If the material violation was intentional or reckless or resulted from willful misconduct by the mortgage servicer, the court may award the borrower the greater of treble actual damages or statutory damages of $50,000.  A prevailing borrower under either Section 2924.19 or 2424.12 may be awarded attorney's fees and costs.

133.     The foregoing is in addition to any other rights, remedies, or procedures available under any other law. A violation of the sections shall also be deemed a violation of the lender's license, and subject it to appropriate action by its licensing agency.

134.     California Code of Civil Procedure, Section 2924(a)(6) was added stating that **no entity shall record or cause a notice of default to be recorded or otherwise initiate the foreclosure process unless it is the holder of the beneficial interest under the mortgage or deed of trust**, the trustee under the deed of trust, or the designated agent of the holder of the beneficial interest acting within the scope of its authority.

135.     Defendant QUALITY LOAN SERVICING CORPORATION fraudulently recorded NODs repeatedly, despite the fact, it did not have authority.

## COUNT IV:  VIOLATION OF THE TRUTH IN LENDING ACT (TILA) §1641(g)

136.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

137.     An amendment to the TILA (effective since the Helping Families Save their Home Act of 2009) compels a creditor to provide the borrower with a disclosure when the debt (Note) is sold to a new owner.  See 15 U.S.C. §1641(g).

138.     Contents of the notice must include: 1) the identity, address, and telephone number of the new creditor; 2) the date of transfer; 3) how to reach an agent or party having authority to act on behalf of the new creditor; 3) the location and place where transfer of ownership of the debt is recorded; and 4) any other relevant information regarding the new creditor. Id.

139.     If the creditor fails to provide this notice, the TILA provides for statutory damages of $4,000 per violation plus any actual damages sustained, regardless of intent of the creditor.  See 15 U.S.C. §1640(a)(1, 2).

140.     Defendants never provided such a notice.

## COUNT V:  SIX-YEAR STATUTE OF LIMITATIONS EXPIRED TO FORECLOSE

141.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

142.    Under California law, a real Property lien and the power of sale to enforce it become void if a mortgagee does not seek to foreclosure under a DOT within six-years of the date the cause of action accrues.  To satisfy the statute of limitations, mortgagees must either bring suit for judicial foreclosure or complete a nonjudicial foreclosure sale within six-years of acceleration.

143.    California Code, Commercial Code - COM § 3118, states, (a)  Except as provided in subdivision (e), an action to enforce the obligation of a party to pay a note payable at a definite time shall be commenced within six years after the due date or dates stated in the note or, if a due date is accelerated, within six years after the accelerated due date.

144.    Plaintiff 's last acceleration was dated May 4, 2010.

## COUNT VI:  PROMISSORY ESTOPPEL

145.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

146.    Promissory estoppel serves as a "consideration substitute" in contract law that renders certain promises otherwise lacking in consideration binding and enforceable. In such cases, the promisee's reliance is treated as an independent and sufficient basis for enforcing the promise. Promissory estoppel can be viewed as a legal device that prohibits the promissor from denying the existence of a contract for lack of consideration.

147.    In general, the elements of promissory estoppel are:  1) a promise reasonably expected by the promissor to induce action or forbearance; 2) action or

forbearance by the promisee in justifiable reliance on the promise (i.e. "detrimental reliance"); 3) injustice can be avoided only through enforcement of the promise.

148.     Plaintiff's entire life (family, friends, work, fellowship…) relied on the promise that was made to her when she purchased her home.  Although, Plaintiff's Note and DOT are unlawful, the reliance is enforceable, as promised. For the past eleven (11) years, Plaintiff has been in a fragmented state of mine, unable to stay focus, due to the on-going high level of stress in her life, inflicted by Defendants.

149.     As a direct and proximate result of the Defendants' conduct, Plaintiff has been damaged in an amount to be established at trial.

150.     As a result, Plaintiff has suffered physical, psychological, emotional, and economic damages.

## COUNT VII:  WRONGFUL FORECLOSURE

151.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

152.     In California, the tort of wrongful foreclosure requires: (1) a legally owed duty to the Plaintiff by the foreclosing party (2) a breach of that duty (3) a causal connection between the breach of that duty and the injury the Plaintiff sustained, and (4) damages.

153.     California courts have further clarified this cause of action by stating, a trustee or mortgagee may be liable to the trustor or mortgagor for damages sustained where there has been an illegal, fraudulent or willfully oppressive sale of property under a power of sale contained in a mortgage or deed of trust." *Munger v. Moore, 11 Cal. App. 3d 1, 7, [89 Cal. Rptr. 323, 326] (Cal. Ct. App. 1970)*

154.     Plaintiff's foreclosure was illegal, fraudulent, and willfully
oppressive. Plaintiff has suffered emotional distress as a proximate cause of
Defendants' wrongful conduct. Where there is a wrongful foreclosure, the
borrower may seek punitive damages. *Kachlon v. Markowitz (2008) 168
Cal.App.4th 316, 345 [85 Cal.Rptr.3d 532, 554].*

155.     Plaintiff's Property was foreclosure upon utilizing fraudulent
recorded documents. The purported Trustee and Mortgagee was knowledgeable of
the fraudulent documents, but caused the foreclosed anyway.

## COUNT VIII:  WRONGFUL EVICTION

156.     Plaintiff re-alleges and incorporates by reference all preceding
paragraphs as though fully set forth herein.

157.     Defendants evicted Plaintiff pursuant to 1161a, which authorizes the
purchaser at of a Trustee's Sale to evict the former owner of the property through
an unlawful detainer action. *Gross v. Superior Court (1985) 171 Cal.Appl3d 265,
271.*

158.     Under section 1161a, a purchaser who has acquired the title at such
Trustee's Sale must prove that the property was sold in accordance with section
2924 of the Civil Code and that title under the sale has been duly perfected.
(*Seidell v. Anglo-California Trust Co. (1942) 55 Cal.App.2d 913, 920, italics
added.*)

159.     The Defendant in an unlawful detainer action may challenge title to
the limited extent the defendant contends the sale was not properly conducted
pursuant to section 2924 of the Civil Code by a person or entity acting "under a
power of sale contained in a deed of trust", and that title to the property sold at the
Trustee's auction was not "duly perfected."  Civil Code Procedure, § 1161a, (b)(3).

160.     Pursuant to Civil Code Procedure, section 2924 (a)(1), (3), (4) requires that the trustee or other entity conducting the auction is actually "authorized" to do so.  A Trustee's authorization must come from the DOT either because it was the original named Trustee, or because it was substituted for the original trustee, or for an Intervening Substitute Trustee.  Civil Code Procedure, §§ 2924a, 2934a.

161.     Title is duly perfected when all steps have been taken to make it perfect, i.e., to convey to the purchaser that which he has purchased, valid and good beyond all reasonable doubt, which includes good record title.  Under a DOT, power of sale upon the trustor's default vest in the trustee.  *Calvo v. HSBC Bank USA, N.A. (2011) 199 Cal.App.4th 118, 122*.  Therefore, in order to prove compliance with § 2924, the Plaintiff must necessarily prove the sale was conducted by the Trustee.  *The Bank of New York Mellon v. Vidal A. Preciado (2014) 224 Cal.App.4th Supp. 1, 7-8*.

162.     In an unlawful detainer action, it is the plaintiff's burden to establish duly perfected title to the property and the plaintiff failed to do so.

163.     The Trustee Upon Sale reflects the Property was sold by Defendant QUALITY LOAN SERVICE CORPORATION, acting as trustee under a fraudulent DOT.

164.     Deputy Sheriffs used excessive force, without cause, to evict Plaintiff and her family.  Defendants had no legal standing to evict Plaintiff.

165.     Defendants failed to give Plaintiff notice and failed to properly serve Plaintiff so she may appear in unlawful detainer court and present the fraudulent documents that support the Wrongful Foreclose.  Defendant's act was deliberate and unlawful.

166.    Plaintiff was heard in an Ex Parte Hearing, where fraud against her Property was ignored. No party with standing to evict Plaintiff from her home was present and all testimonies were hearsay.

167.    A tenant who has been a victim of wrongful eviction can file a lawsuit against the landlord and receive compensation for certain damages, including: Statutory Damages: Depending on your particular situation, they may be calculated per day or per violation. Many local rent ordinances provide for trebled (triple) damages. Actual Damages: These can temporary housing costs or increased rent if the tenant has been displaced and forced to incur additional costs. Pain, suffering, and inconvenience can be included. Other Expenses: Court costs and reasonable attorney's fees if you hire an attorney to represent you.

168.    As a result, Plaintiff has suffered physical, psychological, emotional, and economic damages.

## COUNT IX: BREACH OF CONTRACT

169.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

170.    Plaintiff is required to plead and show specific elements: (1) The existence of a contract; (2) Plaintiff's performance or excuse for nonperformance; (3) Defendant's breach, and (4) Damages to Plaintiff there from.

171.    The Deed of Trust in this case is an enforceable contract under CALIFORNIA law. The purported Deed of Trust defines "Lender" as "COUNTRYWIDE BANK, FSB".

172.    "MERS" is defined as "a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns . . . MERS is a beneficiary under this Security Instrument . . ."

173.     The term 'Lender' includes any **holder of the Note** who is entitled to receive payments under the Note." Only the "Lender" can foreclose on the property. **Plaintiff's Note was secured by a fraudulent DOT**.

174.     The foreclosing party under the Deed of Trust must be a "Lender" as the Deed of Trust defines "Lender." No Defendant is or can be a "Lender" with power to foreclose because the Deed of Trust defines "Lender" to "include "any Note Holder," and no Defendant can prove it holds or held the Note.  The only other party that can be a "Lender" under the Deed of Trust, other than the Note Holder, is the original lender, who sold the Note along the chain of securitization years ago.

175.     In order for the original lender to sell the Note they must abide by the Deed of Trust which states the Note must be sold "together with the security instrument." No Defendant properly transferred the Note "together with" the Deed of Trust; therefore, no Defendant is a "Lender" with the right to foreclose under the Deed of Trust.

176.     Defendants have breached the Deed of Trust by causing to be filed documents in the Real Property records indicating they have a secured interest under the Deed of Trust when they do not and cannot act as a "Lender" under that instrument.

177.     Defendants' breach has caused Plaintiff damages, and such breach is the proximate cause of those un-liquidated damages.


## COUNT X:  FRAUD AND DECEIT

178.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

179.     "Actual fraud occurs, when, among other circumstances, a person makes a promise without the intention of performing it.  To prove a cause of action for actual fraud requires evidence of" '(1) representation; (2) falsity; (3) knowledge of falsity; (4) intent to deceive; and (5) reliance and resulting damage (causation).'  Fraud causes of action must be pled with specificity.  *Hills Transportation Co. v. Southwest Forest Ind., Inc. (1968) 266 Cal.App.2d. 702, 707.*  The Complaint must allege facts as to "how, when, where, to whom, and by what means the representations were tendered.''  *Stansfield v. Starkey (1990) 220 Cal.App.3d 59, 73.*

180.     The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written" *Tarmann v. State Farm Mut. Auto. Ins. Co. (1991) 2 Cal. App. 4th 153, 157.*

181.     "It is the general rule that courts have power to vacate a foreclosure sale where there has been fraud in the procurement of the foreclosure decree or where the sale has been improperly, unfairly or unlawfully conducted, or is tainted by fraud, or where there has been such a mistake that to allow it to stand would be inequitable to purchaser and parties." Bank of America Nat'l Trust & Sav. Ass'n v. Reidy, 15 Cal.2d 243, 248 (1940).

182.     Plaintiff alleges that there is evidence of prejudicial procedural irregularity, and that there are no documents or records that can be produced, demonstrating proper assignment of the Deed of Trust, and proper Substitution of Trustee.

183.     As a result of COUNTRYWIDE's systemic disregard for its underwriting guidelines, many homeowners lost their homes and drove

COUNTRYWIDE to the brink of bankruptcy.  To survive, COUNTRYWIDE
merged with Defendant BOA in a $4.1 billion stock exchange in January 2008.

184.       As reported by the Federal Bureau of Investigation ("FBI") in its 2006
and 2007 Mortgage Fraud Reports, a study of three million residential mortgage
loans found that between 30% and 70% of early payment defaults were linked to
significant misrepresentations in the original loan applications.  The
misrepresentations included income inflated by as much as 500%, appraisals that
overvalued the property by 50% or more and fictitious employers and falsified tax
returns.

185.       As set forth above, it is now apparent that COUNTRYWIDE
mortgage originators routinely encouraged such misstatements and omissions in
loan applications.

186.       Plaintiff alleges that there are no documents or records that can be
produced, demonstrating prior to the required "Closing Date" for the REMIC, the
Note was duly indorsed, transferred and delivered to the REMIC, including all
intervening transfers.

187.       Plaintiff alleges that Defendants cannot show proper receipt,
possession, transfer, negotiations, assignment and ownership of the borrower's
original Promissory Note and Deed of Trust, resulting in imperfect security
interests and claims.

188.       Plaintiff alleges that Defendants cannot establish possession and
proper transfer and/or indorsement of the Promissory Note and/or proper
assignment of the Deed of Trust; therefore, none of the Defendants have perfected
any claim of title or security interest in the Property. Defendants do not have the
ability to establish that the mortgages that secure the indebtedness, or Note, were
legally or properly acquired.

189.     No recorded assignments of the Deed of Trust or transfers to gain
ownership of Plaintiff's Mortgage, was ever recorded in the local real property
records, as required under the PSA.

**COUNT XI: DECLARATORY RELIEF**

190.     Plaintiff re-alleges and incorporates by reference all preceding
paragraphs as though fully set forth herein.

191.     "[D]eclaratory relief is designed in a large part as a practical means of
resolving controversies, so that parties can conform their conduct to the law and
prevent future litigation." *Meyer v. Sprint Spectrum L.P., (2009) 45 Cal.4th 634,
648*.

192.     Plaintiff believes that Defendants dispute Plaintiff's contention, and
instead contend that Defendants and their affiliates had the legal right to foreclose
on the Plaintiff's Property.

193.     Plaintiff therefore request a judicial determination of the rights,
obligations and interest of the parties with regard to the ownership of the Property
and the Note, and such determination is necessary and appropriate at this time
under the circumstances so that all parties may ascertain and know their rights,
obligations and interests with regard to the Property and the Note.

194.     Plaintiff requests a determination of whether any Defendant had
authority to foreclose on the Property.

195.     Plaintiff request an order declaring that Plaintiff is entitled to the
exclusive possession of the Property, and that Defendants have no monetary
interest in the Note or Property.

196.    Plaintiff requests an order declaring that Plaintiff owns in fee simple, and is entitled to the quiet and peaceful possession of, the above-described real property, as against all Defendants, and the world.

197.    Plaintiff also requests an order declaring and adjudges that Defendant, and each of them, and all persons claiming under them, have no estate, right, title, lien, or interest in or to the Property or any part of the Property.

## COUNT XII: QUIET TITLE

198.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

199.    Plaintiff seeks a determination of title under California Code of Civil Procedure Part 2, Title 10, Chapter 4 and Section 764.080 (a) (b).

200.    To maintain this cause of action, Plaintiff must allege the Defendant asserts an adverse, superior claim to title. *Twain v. Harle Homeowner Ass'n v. Patterson, 193 Cal.App.3d 184, 188 (1987).*  A Quiet Title action is framed simply by alleging that the Plaintiff is the owner and entitle to possession and that the Defendant claims an interest, adverse to the Plaintiff, without right. *Wolfe v. Lipsy, 163 Cal. Appl. 3d 633 (1985).*

201.    Further, CCP section 761.010(b) requires a Plaintiff bringing a Quiet Title Action to record a Lis Pendens "[i]mmediately upon commencement of the action."

202.    Plaintiff seeks Quiet Title and such a determination is sough due to the Wrongful Foreclosure described herein. All Defendants named herein claim or wrongly claimed, at some time, a secured monetary interest and estate in the Property. Defendants appear to claim the ownership of the Note and corresponding power of sale under the fraudulent Deed of Trust securing the Note.

203.     The claim of all Defendants, past, present, and future, are without and are without any right whatsoever, and no Defendant has a right, estate, title, lien power of sale or any interest of any kind in or to the Property, or any part of the Property.

204.     Plaintiff, therefore, alleges that none of the Defendants in this case, now or at any time, hold/held a perfected, legal, and secured claim in the Property; and that all Defendants are estopped and precluded from asserting an unsecured claim against Plaintiff's estate.

205.     Plaintiff, therefore, alleges that none of the parties to the securitization transaction, nor any of the Defendants in this case, now or at any time, hold/held a perfected, legal, and secured claim in the Property; and that all Defendants are estopped and precluded from asserting an unsecured claim against Plaintiff's estate.

206.     Plaintiff requests the decree permanently enjoining Defendants, and all persons claiming under them, from asserting any claim to Plaintiff's title to the Property.


## COUNT XIII:  DEFAMATION OF CHARACTER

207.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

208.     Defendants have published false statements to the Credit Bureaus and have sent false statements detailed in Notices mailed.  This act was deliberate to humiliate Plaintiff publically.

209.     The essence of the publications, when taken as a whole and as would have been perceived by a reasonable reader, states:  (a) Plaintiff is irresponsible and refuses to pay her bills; and (b) Plaintiff is not trustworthy.

210. Defendants' calculated and designed scheme is to leave the public, viewer, or reader with an entirely false and untrue impression that Plaintiff is not trustworthy, she refuses to pay her bills, and as a result she has lost her home to foreclosure. These untrue statements of Plaintiff have defamed her, thus causing her injury, embarrassment, humiliation and other compensable damages.

211. The false information published by Defendants as alleged in this Third Amended Complaint is defamatory, in that, as reasonably understood, the information tended to harm the character and reputation of Plaintiff, so as to lower her in the opinion and estimation of the community, and in her profession, and to deter other persons from associating or dealing with her.

212. Defendants published the false statements to countless individuals, knowing the statements were false, acting with reckless disregard for whether the statements were true, intending to leave a false impression, acting with ill will, or intending to harm Plaintiff, her reputation and good will. Accordingly, Defendants' acts were committed with actual malice.

213. As a result of the dissemination of the defamatory statements, innuendos, and implications, Plaintiff has suffered damages and seeks recovery.

**COUNT XIV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

214. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

215. Infliction of Emotional Distress must plead facts demonstrating (1) extreme and outrageous conduct by the Defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) Plaintiffs' suffered severe or extreme emotional distress and (3) Plaintiff's injuries were actually and proximately caused by the Defendants' outrageous conduct.

216.     Defendants' actions concerning Plaintiff's Property were intentional and reckless.

217.     Defendants' conduct regarding Plaintiff's Property was extreme and outrageous.

218.     Defendants' actions and conduct proximately caused Plaintiff to suffer severe emotional distress.

219.     Defendants' carelessness in not exercising the laws that protect the people, where ordinary and reasonable care should have been exercised, caused Plaintiff harm.

220.     Plaintiff's Promissory Note and Deed of Trust was sold into a REMIC; PSA requirements were ignored and fraudulent Deed of Trust was reassigned.

221.     Defendants engaged in conduct described herein, with the intention of reckless disregard of the probability of causing severe or extreme emotional distress to Plaintiff.

222.     Defendants intentionally caused Plaintiff extreme psychological suffering through its actions.  The conduct of Defendants was outrageous and goes beyond all bounds of human decency, resulting in Plaintiff's homelessness.

223.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer severe and extreme emotional distress of such substantial quantity or enduring quality that no reasonable person in a civilized society should be expected to endure.  Plaintiff allege that such severe emotional distress has included without limitations embarrassment, anger, chagrin, disappointment, shame, worry, nausea and other forms of mental and emotional anguish.

224.  Defendants' outrageous conduct was the actual and proximate cause of the emotional distress discussed herein.  As a direct and proximate result of the Defendants' conduct, Plaintiff has been damaged in an amount to be established at trial.

225.  Defendants' conduct intentionally and/or recklessly caused extreme emotional distress to Plaintiff and has been intentional, malicious and oppressive, thereby entitling Plaintiff to recover punitive damages in an amount to be determined at trial.

226.  Plaintiff seeks recovery for actual damages, including metal anguish and medical expenses, court costs, interest, and punitive damages.

## COUNT XV:  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

227.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

228.  Plaintiff must allege: (1) a legal duty to use due care (2) breach of that duty, (3) the breach as proximate cause of resulting injury and (4) damages.

229.  Defendants engaged in "conduct intended to inflict injury or engaged in with the realization that injury will result", as described herein.

230.  Defendants' unlawful business practices of wanting to continue to hide material facts regarding Plaintiff's original Grant Deed and Mortgage, Plaintiff has been subjected to tortuous treatment, extreme prejudice in the manner in which Plaintiff's account has been handled.  Defendants' treatment has appeared progressively intentional, designed to make sure Plaintiff lose her physical and emotional abilities to seek justice.

231.  Plaintiff has demonstrated herein how Defendants conspired against Plaintiff, inflicting continuous emotional distress, for one cause, "economic gain."

The scheme consisted of taking Plaintiff's home, violating her rights, despite her becoming physically harmed and homeless.

232.    Defendants owed Plaintiff a duty of care and as a result of Defendants' Unlawful Business Practices, the breaches of duty alleged herein, resulting in a direct and proximate cause in Plaintiff's pain and suffering.  Plaintiff suffered and continues to suffer physical, psychological, emotional, and economic damages, all in an amount to be proven at trial.

## COUNT XVI:  UNFAIR COMPETITION

233.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

234.    Defendants are a business that have engaged in acts or practices that are unlawful, fraudulent and unfair with respects to their dealings with and concerning Plaintiff.

235.    California state courts have repeatedly held that all that is necessary to establish a violation of B&P § 17200 et seq., is to show that the defendant is a business engaged in acts or practices that are unlawful, fraudulent or unfair.  " *Daugherty v. American Honda Motor Co., Inc. (2006) 144 Cal. App. 4th 824, 837.*

236.    The unlawful practices prohibited by the statute are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court made. *Saunders v. Superior Court (1994) 27 Cal. App. 4th 832, 838-39.*

237.    An unlawful business practice or act is "unfair" when it "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. *People v. Casa Blanca Convalescent Homes, Inc. (1984) 159 Cal. App. 3d 509, 530.*

238.     Defendants' conduct constituted an unlawful business act or practice in that it violated numerous Federal Laws pertaining to real property.

239.     Plaintiff alleges that Defendants' conduct constituted an unfair business act or practice under Bus. and Prof. Code 17200, violating numerous Federal laws pertaining to real property.  Defendants' conduct has inflicted and continues to inflict harm onto Plaintiff, such conduct is without any legitimate business justification, and such conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiff and to the public at large.  The harm to Plaintiff caused by Defendants' conduct far outweighs any alleged benefits that Defendants might claim.

240.     Defendants' unlawful business practices were intentional, malicious and oppressive, which has physically harmed Plaintiff, thereby entitling Plaintiff to recover punitive damages in an amount to be determined at trial.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

1. Plaintiff is the fee simple owner of all rights, title, and interest in and to the described real property;

2. Defendants do not have any right, title, estate, or interest in or lien on the described real property;

3. Actual Damages in a sum according to proof, but not less than $7,000,000.00.

4. Special Damages in an amount to be determined by proof at trial;

5. General Damages in an amount to be determined by proof at trial;

6. Punitive Damages in the sum, no less than $63,000,000.00;

7. Restitution as allowed by law;

8. Reasonable Attorney's cost and expenses incurred in this action, including counsel fees and expert fees; and

9. Such other relief as the Court may deem just and proper.

Plaintiff hereby demands a jury trial on all issues raised in this complaint.

DATED:___July 27, 2018___     Respectfully submitted,

                              **THE LAW OFFICES OF**
                              **ANGELA SWAN, APC**

                              BY:_____
                                    Angela Swan, Esq.,
                                    Attorney for Billie Rene Frances Lillian
                                    Powers

## **VERIFICATION**

VERIFIED THIRD AMENDED COMPLAINT

48

1    i am the Plaintiff in this action. i have read the foregoing Third Amended

2  Complaint, and it is true of my own knowledge, except as to those matters stated

3  on information or belief, and as to those matters, i believe it to be true.

4         I declare under penalty of perjury under the laws of the State of

5  California that the foregoing is true and correct.

6

7  Executed on _____July 27_____ , 2018 at _____Torrance_____ , California.

8

9

10                                      BY: _____

11

                                          Billie Rene Frances Lillian Powers

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED THIRD AMENDED COMPLAINT

49